FILED
2018 FEB 23 AM 11: 13
AJ WILLIAMS
COMMON PLEAS COURT
GREENE COUNTY, OHIO

IN THE COURT OF COMMON PLEAS
GREENE COUNTY, OHIO

| | | |
|---|---|---|
| **myCUmortgage, LLC** <br> 3560 Pentagon Blvd., Suite 301 <br> Beavercreek, Ohio 45431 | * <br> * <br> * <br> * | CASE NO. 2018CV0118 <br> Judge JUDGE WOLAVER |
| **Plaintiff** | * <br> * | |
| v. | * <br> * | **COMPLAINT FOR DAMAGES AND FOR DECLARATORY JUDGMENT** |
| **CENLAR FSB** <br> 425 Phillips Boulevard <br> Ewing, New Jersey 08618 | * <br> * <br> * <br> * <br> * | |
| **Defendant** | * | |

Plaintiff, myCUmortgage, LLC (referred to herein as "Plaintiff" or "myCU"), f/k/a Wright-Patt Financial Group Ltd., by and through counsel, states as follows for its Complaint against Defendant, Cenlar FSB, (referred to hereinafter as "Defendant" or "Cenlar"):

**PARTIES, JURISDICTION, AND VENUE**

1. Plaintiff, myCUmortgage, LLC, is an Ohio corporation licensed to transact business in the State of Ohio, with its principal office located at 3560 Pentagon Blvd., Suite 301, Beavercreek, Ohio 45431.

2. Upon information and belief, Cenlar is a federally chartered savings bank having FDIC Certificate No. 30996, with its principal office located at 425 Phillips Boulevard, Ewing, New Jersey 08618.

3. Cenlar is a wholesale bank specializing in mortgage sub-servicing nationwide. According to Inside Mortgage Finance, Cenlar is the largest subservicer of residential mortgages in the country with a 28.5% market share and $532 billion in loans under management. Cenlar is an approved loan servicer for Fannie Mae, Freddie Mac, and Ginnie Mae, among others. Cenlar represents to its business partners and the public that it is a leading loan servicing provider and has been actively engaged in mortgage loan servicing and subservicing as a core business for more than 40 years.

4. Wright-Patt Financial Group, LTD ("WPFG") and Cenlar entered into a Subservicing Agreement ("Agreement"), on June 1, 2008. A true and accurate copy of this Agreement is attached to this Complaint as Exhibit A.

5. According to the Agreement, it shall be construed in accordance with the laws of the State of New Jersey. See Exhibit A, Section 9.7.

6. The Agreement contains no language designating an agreed upon venue or court.

7. Venue and Jurisdiction are proper in this Court, as Cenlar entered into an Agreement with a Company located in Greene County, Ohio, Cenlar conducted business activity in Ohio through the provision of residential mortgage loan servicing to Ohio consumers, and Cenlar committed tortious acts in Ohio against an Ohio company.

## FACTS

8. myCU incorporates Paragraphs 1 through 7 as if fully rewritten herein.

9. On November 8, 2010, WPFG underwent a merger transaction. Pursuant to this merger, a now inactive Ohio limited liability company, formerly identified as Ohio Secretary of State Entity No. 1119958, was merged into WPFG. As a result of the merger, WPFG was the surviving entity, but it had changed its name to myCUmortgage, LLC.

10. Cenlar acknowledged that myCU is the successor in interest to WPFG and the counterparty to the Agreement, as evidenced in part by the First Amendment to the Agreement dated November 1, 2011, and is by and between Cenlar and myCU.

11. Pursuant to the Agreement, Cenlar agreed to service residential mortgage loans for myCU.

12. Pursuant to the Agreement, myCU paid to Cenlar an initial setup fee of $3.30 per each existing loan at the time loans were transferred to Cenlar. myCU then paid Cenlar a $7.50 fee, adjusted for inflation under the terms of the Agreement, for each future loan after the initial setup and transfer of existing loans.

13. myCU, as successor by merger to WPFG, and Cenlar entered into a First Amendment to Subservicing Agreement ("First Amendment"), on November 1, 2011. A true and accurate copy of the First Amendment is attached to this Complaint as Exhibit B.

14. The First Amendment, among other things, deleted and replaced Exhibit II and Exhibit III, the fee schedules, and extended the Agreement until May 31, 2016.

15. myCU and Cenlar entered into a Second Amendment to Subservicing Agreement ("Second Amendment"), on December 1, 2015. A true and accurate copy of the Second Amendment is attached to this Complaint as Exhibit C.

16. The parties agreed in the Second Amendment to once again extend the term of the Agreement, this time until May 31, 2017, and to again replace Exhibits II and III in their entirety.

17. myCU informed Cenlar verbally that it intended to build its own servicing function and transfer the loans. Cenlar agreed that the one-year extension was prudent to provide adequate time for myCU to complete its build out. Cenlar also charged an additional $1.00 per loan per month.

18. Pursuant to the Agreement, Cenlar agreed, among other things, to comply with all applicable state and federal legal and regulatory requirements, best servicing level commitments, procedures, bookkeeping, accounting, reporting, and specific services. See Sections 2.1 -2.11 and Exhibits IV and VIII to the Agreement.

19. During the term of the Agreement, and in breach of the Agreement, Cenlar failed to keep its promises to comply with all applicable state and federal legal and regulatory requirements, best servicing level commitments, certain procedures, bookkeeping, accounting, reporting, and specific services.

20. These failures and material breaches proximately resulted in litigation costs, regulatory issues, unnecessary expenditure of employee time and other damages for myCU. myCU suffered and continues to suffer economic damages, irreparable harm and other damages as a result of these material breaches.

21. The term of the original Agreement was to end at twelve o'clock midnight (12:00 A.M. eastern time) on May 31, 2013, except that if neither party terminated the Agreement by one hundred twenty (120) days written notice to the other prior to the expiration of the initial term, the Agreement shall renew itself and exist and continue for successive terms of five (5) years each until terminated by such notice. Section 5.1 of Exhibit A.

22. Expiration of the Agreement is not defined in the Agreement and it is ambiguous as to when and/or if the Agreement ever expires.

23. At any time during the Agreement, myCU may, without cause, and on ninety (90) days written notice to Cenlar, terminate the Agreement. Section 5.2 of Exhibit A.

24. Upon expiration or termination of the Agreement as to any or all Mortgage Loans, myCU shall reimburse Cenlar for all costs reasonably incurred in connection with the expiration

or termination of subservicing and the return of documents and other information regarding the Mortgage Loans then subserviced for myCU. In addition, myCU shall reimburse Cenlar for its actual expenses and any Servicing Advances made on behalf of myCU in accordance with the terms of the Agreement. Section 5.4 of Exhibit A.

25. The Agreement also provides that upon expiration or termination of the Agreement by myCU without cause, myCU shall pay Subservicer an Exit Fee, above and beyond Cenlar's costs reasonably incurred in connection with the expiration or termination of subservicing and return of documents and other information regarding the Mortgage Loans then subserviced for myCU. Section 5.3 of Exhibit A.

26. At any time during the Agreement, Cenlar may, without cause, and on one hundred and eighty (180) days written notice to myCU, terminate the Agreement. In such event, Cenlar's obligation to reimburse myCU for the costs associated with transfer of the Mortgage Loans is limited to $3.30 per loan. Cenlar has no obligation to pay an Exit Fee to myCU under any circumstances. Section 5.2 of Exhibit A.

27. Under Section 5.3 of the Agreement, either party may terminate the Agreement with cause if a material breach is not cured within 30 days of written notice of such breach or if the breach is such a type as to be incapable of being cured (Section 5.3, 6.2, 9.8). The non-breaching party, in addition to all other amounts due, shall be entitled to all costs of collection and all costs related to the transfer of the Mortgage Loan Documents and other data and information related to the Mortgage Loans (Section 5.3). Cenlar, if it is the non-breaching party, is also entitled to the payment of the Exit Fee (Section 5.3). myCU is not entitled to the Exit Fee, even if it is the non-breaching party.

28. In addition to the foregoing, the Agreement provides that myCU shall reimburse Cenlar for all costs reasonably incurred in connection with the expiration or termination (with or without cause, by either party) of subservicing and return of documents and other information regarding the Mortgage Loans then subserviced for myCU.

29. According to Exhibit II of the Agreement, the Exit Fee, for termination without cause, is $40.00 per loan that has been serviced by Cenlar for less than 6 months, $30.00 per loan that has been serviced by Cenlar for 6 to 12 months, $25.00 for each loan in year 2 of servicing by Cenlar, and $20.00 for every loan serviced by Cenlar for 3 or more years.

30. The updated and revised Exhibit II in the First Amendment did not include Exit Fees. See Exhibit B to this Complaint.

31. The updated and revised Exhibit II in the Second Amendment again listed Exit Fees of $40.00 per loan that has been serviced by Cenlar for less than 6 months, $30.00 per loan that has been serviced by Cenlar for 6 to 12 months, $25.00 for each loan in year 2 of servicing by Cenlar, and $20.00 for every loan serviced by Cenlar for 3 or more years. See Exhibit C to this Complaint.

32. The Exit Fee bears no reasonable relationship to Cenlar's costs and is in fact duplicative of such costs, which are covered under Section 5.4 of the Agreement.

33. A breach of the Agreement by myCU is not included as a predicate to imposition of the Exit Fee.

34. Cenlar has never alleged, and has no grounds to allege, a breach of the Agreement by myCU.

35. The Exit Fee is an unenforceable penalty in connection with the expiration and/or termination of the Agreement.

36. In January 2017, myCU provided notice to Cenlar of its intent to allow the Subservicing Agreement (the "Agreement") to expire on May 31, 2017. myCU also requested that Cenlar transfer the Mortgage Loans to myCU prior to the expiration date.

37. While transferring the Mortgage Loans, documents and information related to servicing to myCU, Cenlar committed additional material breaches of the Agreement.

38. As part of its transfer obligations, Cenlar agreed, among other things, to continue to comply with all applicable state and federal legal and regulatory requirements, best servicing level commitments, procedures, bookkeeping, accounting, reporting, and specific services, including but not limited to the payment of insurance premiums and processing borrower assumption requests.

39. As part of its transfer obligations, Cenlar was required to timely tender a draft of a regulatory mandated Good-bye Letter, work with myCU on the final draft, and mail out the agreed upon final draft of the Good-bye Letter. The Good-bye Letter is intended in part to prevent a disruption of borrowers' automatic payments on mortgage loans, communicate an agreed upon message and directions to borrowers, and continue ACH drafting against borrower accounts.

40. As part of its transfer obligations, Cenlar was required to transfer borrower Escrow Payments, transfer borrower Mortgage Loan payments in a timely manner, timely report Cenlar's servicing activities, issue proper notification of service change to mortgage loan insurers, provide a detailed accounting to support Cenlar's May 2017 servicing invoice, properly code all Mortgage Loans for May 2017 transfer, provide electronic copies of all communication with borrowers and regarding borrowers and/or loans, provide information to determine if Mortgage Loans were serviced in accordance with applicable requirements during the term of the

Agreement, and map and index loans to ensure all associated loan documents are matched to the proper loan, and transfer all imaged files.

41. Cenlar failed to comply with the above requirements, procedures, servicing obligations, and promises. Cenlar's acts and/or omissions caused a myriad of Mortgage Loan level issues, including but not limited to causing borrower payments to be delinquent, mishandling of insurance claims and payments, inability to timely file insurance and investor claims, inability to timely process foreclosure claims, mishandling of express directions from myCU concerning short sales and decedent borrower accounts, as well as regulatory issues and violations.

42. Discovery is necessary to determine the full extent of Cenlar's failures, material breaches and damages proximately caused to myCU as Cenlar has failed to provide the necessary detail to conduct a full evaluation of the status of the mortgage loans.

43. myCU notified Cenlar on several occasions of the known material breaches and repeatedly requested information and assistance in determining the full scope of Cenlar's material breaches. Cenlar repeatedly failed to cooperate in a timely manner and as of the date of this Complaint has failed to fully disclose known servicing failures associated with the Mortgage Loans.

44. These failures and material breaches caused litigation costs, regulatory issues, reputational risk, negatively impacted borrowers and other damages for myCU. myCU suffered and continues to suffer economic damages, reputational damages with clients and investors, irreparable harm and other damages as a result of Cenlar's material breaches.

45. Cenlar claimed that its costs reasonably incurred in connection with the expiration or termination of subservicing and return of documents and other information regarding the Mortgage Loans then subserviced for myCU was approximately $50,000.00.

46. myCU paid Cenlar in full for its costs reasonably incurred in connection with the expiration or termination of subservicing and return of documents and other information regarding the Mortgage Loans then subserviced for myCU.

47. Despite being reimbursed for all of its actual costs, Cenlar also claimed entitlement to an Exit Fee of approximately $941,796.33.

48. myCU refused to consider any purported penalty/Exit Fee until after Cenlar had fully performed its obligations under the Agreement, including those duties related to transfer of the Mortgage Loans.

49. myCU repeatedly requested a detailed accounting to support the purported Exit Fee and further requested that Cenlar fully perform its obligations under the Agreement.

50. Cenlar failed and refused to provide any accounting or other explanation to support the amount of the purported Exit Fee.

51. On or about April 4, 2017, Cenlar attempted to convert funds to satisfy the purported Exit Fee by attempting to ACH debit myCU's account without consent. myCU discovered and stopped the ACH debit attempt.

52. The majority of the Mortgage Loans were transferred to myCU on or about May 1, and 2, 2017. Cenlar failed to transfer the myCU servicing portfolio in its entirety because Cenlar failed to properly code all loans for the correct transfer data. Cenlar's omission necessitated a second transfer date, resulting in additional costs and expenses to myCU.

53. At the time of the May 2, 2017 transfer, Cenlar, without notice or consent from myCU, improperly withheld approximately $1,500,000.00 from the borrower Escrow Payment account violating the Real Estate Settlement Protections Act, among other things. Borrower Escrow Payments were to be held in trust by Cenlar and represent funds maintained for the express purpose of satisfying borrowers' insurance and tax payments as is necessary to protect the mortgaged properties.

54. myCU repeatedly demanded that Cenlar release the borrower Escrow Payments so that it could service the Mortgage Loans in accordance with applicable laws and regulations.

55. In June 2017, Cenlar released the improperly withheld borrower Escrow Payments to myCU, but first applied $945,693.70 from such funds to purportedly satisfy Cenlar's calculation of the Exit Fee.

56. Specifically, Cenlar's May 2017 servicing invoice stated $905,351.60 was withheld for the Exit Fee and an additional $3,897.37 with withheld for a late fee. The June 2017 invoice billed for an additional Exit Fee of $36,444.73, for loans not included in the original transfer due to Cenlar's negligence, for a total Exit Fee of $945,693.70.

57. Section 2.3 of the Agreement limits Cenlar's use of escrow funds to remittance of taxes, assessments, mortgage insurance premiums, and other such items required to be paid to protect Investors' interests in the underlying property. Cenlar acts as a trustee in the use of these funds.

58. myCU has repeatedly requested that Cenlar return the borrower escrow funds, but Cenlar refused to do so.

59. Cenlar's improper withholding and application of the escrow funds to the Exit Fee constitutes conversion and creates legal, regulatory, and reputation risk for both parties and violated the Real Estate Settlement Procedures Act.

60. Both by contract and Applicable Requirements, Cenlar has no right to apply borrower escrow funds to offset amounts Cenlar claims are due from myCU under the Agreement.

61. Even if the alleged Exit Fee was enforceable, which it is not, myCU's obligation to pay the Exit Fee does not arise until Cenlar has fully performed its obligations under the Agreement, which Cenlar has failed and refused to do.

62. As a direct and proximate result of Cenlar's actions described above, myCU has suffered and continues to suffer economic damages, irreparable harm and other damages. At present, the precise scope, nature and amount of such harm and damages is not possible to completely ascertain or quantify.

63. myCU is entitled to an award of compensatory damages against Cenlar in an amount to be determined at trial. Further, Cenlar's actions were wanton, willful, malicious and/or done with conscious disregard of myCU's rights and in a spirit of ill will, thereby entitling myCU to punitive damages.

## COUNT I
## BREACH OF CONTRACT

64. myCU reiterates and incorporates Paragraphs 1 through 63 as if fully rewritten herein.

65. myCU fully performed its obligations under the Agreement.

66. Cenlar, as described above, materially breached the Agreement by, among other things, failing to comply with applicable requirements, best servicing level commitments,

procedures, bookkeeping, accounting, reporting, and specific services it agreed to in Sections 2.1-2.11 and Exhibits IV and VIII to the Agreement.

67. Cenlar, as described above, materially breached the Agreement and continues to materially breach the Agreement while transferring the servicing of the Mortgage Loans to myCU.

68. As a direct and proximate result of the above, myCU was damaged in an amount exceeding the jurisdictional requirements.

## COUNT II
## CONVERSION

69. myCU reiterates and incorporates Paragraphs 1 through 68 as if fully rewritten herein.

70. myCU had and continues to have the legal right to take possession of all borrower escrow funds for the Mortgage Loans Cenlar was required to transfer to myCU.

71. Cenlar is a trustee of all such borrower escrow funds in its possession.

72. In violation of its fiduciary duty as a trustee, Cenlar wrongfully exercised dominion and control over the borrower escrow funds by wrongfully withholding them from myCU.

73. myCU repeatedly requested and/or demanded Cenlar return the converted funds.

74. Cenlar refused and continues to refuse to return the borrower escrow funds it converted.

75. As a direct and proximate result of the above, myCU was damaged in an amount exceeding jurisdictional requirements.

## EXISTENCE OF A JUSTICIABLE CONTROVERSY FOR DECLARATORY JUDGMENT

76. myCU reiterates and incorporates Paragraphs 1 through 75 as if fully rewritten herein.

77. The parties entered into the Agreement attached as Exhibit A on June 1, 2008.

78. myCU and Cenlar entered into a First Amendment to Subservicing Agreement on November 1, 2011. A true and accurate copy of the First Amendment is attached to this Complaint as Exhibit B.

79. myCU and Cenlar entered into a Second Amendment to Subservicing Agreement on December 1, 2015. A true and accurate copy of the Second Amendment is attached to this Complaint as Exhibit C.

80. In January 2017, myCU provided notice to Cenlar of its intent to allow the Subservicing Agreement to expire on May 31, 2017. myCU also requested Cenlar transfer the subservicing of the mortgage loans to myCU.

81. Cenlar claimed the costs reasonably incurred in connection with the expiration or termination of subservicing and return of documents and other information regarding the Mortgage Loans then subserviced for myCU were approximately $50,000.00.

82. myCU paid Cenlar in full for its costs reasonably incurred in connection with the expiration or termination of subservicing and return of documents and other information regarding the Mortgage Loans then subserviced for myCU.

83. Cenlar also claimed entitlement to an Exit Fee of $941,796.33.

84. myCU refused to consider the Exit Fee until Cenlar completed all obligations related to transfer of the Mortgage Loans and permitted myCU a reasonable period of time to validate Cenlar's performance in accordance with the Agreement and Applicable Requirements.

85. myCU repeatedly requested a detailed accounting to support the purported Exit Fee.

86. myCU repeatedly requested that all transfer activities related to the Mortgage Loans be fully completed by Cenlar and validated by myCU prior to any consideration of the Exit Fee.

87. Cenlar failed and refused to provide any accounting or other explanation to support the amount of the purported Exit Fee.

88. Prior to the May 2, 2017 Mortgage Loan transfer, Cenlar attempted to convert the purported Exit Fee from myCU by attempting to ACH debit myCU's account without consent. myCU discovered and stopped the ACH debit attempt.

89. During the transfer of borrower escrow funds, Cenlar wrongfully withheld approximately $1,500,000.00 from the borrower escrow funds. After repeated demands by myCU, Cenlar released a portion of the borrower escrow funds, but retained $945,693.70.

90. Cenlar's documents stated that $941,796.33 was withheld for the Exit Fee and an additional $3,897.37 was withheld for a late fee.

91. myCU requested and/or demanded Cenlar to return the borrower escrow funds, but Cenlar refused and continues to refuse to do so.

92. Cenlar is a trustee of all such borrower escrow funds in its possession.

93. The Exit Fee bears no reasonable relationship to Cenlar's costs associated with the expiration of the Agreement.

94. The Exit Fee has no reasonable connection to any purported breach of the Agreement by myCU, and Cenlar has never alleged that myCU committed a breach of the Agreement.

95. The Exit Fee is an unenforceable penalty in connection with the expiration and/or termination of the Agreement.

96. Expiration of the Agreement is not defined in the Agreement and it is ambiguous as to when and/or if the Agreement ever expires.

97. There are actual controversies between myCU and Cenlar regarding the rights, legal obligations, and enforcement of the purported Exit Fee in the Agreement.

98. myCU seeks a declaration of rights and requests the Court **Find:**

   (a) The purported Exit Fee in Section 5.3 of the Agreement is merely an unenforceable penalty; and

   (b) Cenlar illegally and improperly withheld borrower escrow funds.

99. myCU seeks a declaration of rights and requests the Court to **Order:**

   (a) Cenlar to immediately return the borrower escrow funds it improperly withheld from myCU, with interest.

   (b) Cenlar shall not attempt to collect the unenforceable Exit Fee from any other funds, accounts, or other monies due to or to be transferred to myCU.

   (c) Cenlar shall honor the Agreement and work with myCU to properly transfer any documentation and/or funds and shall cooperate with myCU to identify and fix any legal and/or regulatory issues related to the loans caused by Cenlar.

**WHEREFORE**, Plaintiff, myCUmortgage, LLC, respectfully demands relief as follows:

   i. Judgment against Defendant, Cenlar FSB, on all Counts in an amount of damages greater than jurisdictional requirements;

   ii. An award of pre-judgment and post-judgment interest;

   iii. An award of punitive damages;

   iv. An award of Plaintiff's attorneys' fees, court costs and expenses; and

   v. Such other and further relief as the Court finds just or equitable.

Respectfully submitted,

*signature*

Thomas P. Doyle (0085418)
Doyle & Hassman, LLC
526 York Street
Newport, Kentucky, 41071
Phone: 937-247-0444
Fax:  859-251-5106
Email: tdoyle@doylehassmanlaw.com

and

Thomas B. Bruns (0051212)
Lucinda C. Shirooni (0059047)
Bruns, Connell, Vollmar & Armstrong, LLC
4750 Ashwood Drive, Suite 200
Cincinnati, Ohio 45241
Phone: 513-312-9890
Fax:  513-800-1263
Email: tbruns@bcvalaw.com
       cshirooni@bcvalaw.com

*Attorneys for Plaintiff, myCUmortgage, LLC*

## TO THE CLERK

Please serve a Summons and a copy of the Complaint on the Defendant at the address listed in the caption hereof, by certified mail, return receipt requested.

*signature*

Thomas P. Doyle (0085418)